# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ALEXIS YOCKEY,

    *Plaintiff*,

  v.

                           Case No. 23-cv-0512-ABA

GREATER BALTIMORE MEDICAL
CENTER, INC.,

    *Defendant*

## MEMORANDUM OPINION

Plaintiff Alexis Yockey ("Ms. Yockey" or "Plaintiff") worked as a nurse at Defendant Greater Baltimore Medical Center, Inc. ("GBMC" or "Defendant") prior to and during the COVID-19 pandemic. When COVID-19 vaccines became available, GBMC implemented a policy requiring employees to become vaccinated; the policy provided a process for medical or religious exemptions. Ms. Yockey sought a religious exemption under the policy, which was denied because she worked in a patient-facing role. She resigned shortly after the denial of her exemption request.

Ms. Yockey alleges GBMC's actions constituted religious discrimination under Title VII of the Civil Rights Act of 1964. GBMC has moved for summary judgment. ECF No. 48. For the reasons set forth below, the undisputed evidence establishes that GBMC is entitled to summary judgment on her claims.

## I.     BACKGROUND[1]

At the time of the relevant events, Plaintiff was employed as a nurse at GBMC working primarily with newborn babies and birthing parents in a "Weekend Option" role. ECF No. 49-1 at 118.[2] In this position, Ms. Yockey worked two 12-hour overnight shifts over the weekend, but was paid for 32 hours of work and received health benefits comparable to those of a full-time employee. *Id.* at 118-19, 147. This work schedule was convenient for Ms. Yockey given her custody schedule for her two children. ECF No. 49-1 at 14-15, 116. Ms. Yockey had worked as a Newborn Nursery Nurse since 2008, ECF No. 49-1 at 52, but transitioned to a Mother-Baby Nurse role in mid-2021. ECF No. 49-1 at 46, 55-57.[3]

### A.     GBMC's vaccination policies

In June 2021, GBMC announced a requirement that all employees receive COVID-19 vaccinations by September 1, 2021, unless the employee obtained a medical

---

[1] Citations to page numbers refer to the number appearing in the CM/ECF header for this and the other filings referenced herein, which may not align with a document's original page numbering.

[2] Ms. Yockey was originally hired to work three 12-hour nightshifts per week. ECF No. 49-1 at 57-58, ECF No. 49-2 at 2. Around July 2015, based on childcare needs, Ms. Yockey began switching shifts with colleagues to functionally work weekends only, although that was not her official schedule. *See* 49-1 at 58, 60 ("I asked people if I could work their weekends. So that I could have the schedule of Thursday, Friday, Saturday [nightshifts] every week."). In 2019, she was officially hired in a "Weekend Option" role, ECF 49-1 at 118, 165, and remained on that schedule until her resignation. *Id.* at 57.

[3] During the COVID pandemic, the hospital closed its nursery; infants were kept in the same room as their parent. ECF No. 49-1 at 54. This arrangement led to the Newborn Nursery Nurse caring for the infant while a separate nurse cared for the nursing parent. *Id.* at 56. In 2021, the hospital began to shift to a mother-baby nursing model where a single nurse would care for the "couplet." *Id.* at 61.

or religious exemption. ECF No. 49-3 at 2-3. Following the announcement, GBMC issued a "COVID-19 Vaccination FAQ" email, which stated that employees who decline vaccination "will be required to participate in weekly COVID-19 testing," along with masking and physical distancing. ECF No. 49-4 at 2-3. The following month, GBMC updated the policy to delay the September 1 vaccination deadline "until one of the COVID-19 vaccines is approved by the FDA." ECF No. 49-5 at 2.

In mid-August 2021, citing a spike in Maryland cases and the emergence of the Delta variant, GBMC updated its vaccination policy again to require vaccination by October 1, 2021. ECF No. 49-6 at 2. This iteration of the policy required weekly testing for those with an approved medical or religious exemption, but no longer allowed weekly testing as an alternative to vaccination for anyone without an exemption. *Id.* at 3. The policy further stated that on October 1, unvaccinated employees would be placed on unpaid leave for 30 days, after which their employment would be terminated if they remained unvaccinated and without an approved exemption. *Id.* at 4. On September 28th, GBMC announced a "slight change" to the policy, allowing employees who had received their first vaccine by October 1 to continue working, rather than requiring them to go on unpaid leave, but those employees were still required to complete the vaccine series "on schedule" and undergo weekly testing. ECF No. 48-2 at 38.

## B.    Ms. Yockey's exemption requests and denials

On August 27, 2021, Ms. Yockey applied for a religious exemption from the vaccination requirement. ECF No. 49-7 at 2. Along with her application, she submitted a copy of her certificate of baptism, *id.* at 3, and a letter stating that "[a] Catholic may judge it wrong to receive certain vaccines for a variety of reasons consistent with [authoritative Church] teachings." *Id.* at 5.

3

On September 15, the exemption request was denied. ECF No. 49-8 at 2. The denial letter stated that, assuming that Ms. Yockey had a "sincere religious belief that [she] cannot be vaccinated," *id.,* her request to continue to provide "direct patient care of vulnerable patients" without being vaccinated posed "an undue hardship on GBMC HealthCare." *Id.* GBMC explained that, "[b]ased upon current scientific research and recommendations, we have determined that unvaccinated individuals providing direct patient care pose a direct threat to the health and safety of vulnerable patients, and thereby religious exemptions for those employees constitute an undue hardship." *Id.* The letter noted that GBMC was "willing to consider [Ms. Yockey] for any vacant non-direct patient care positions for which [she] qualif[ies]." *Id.* It also warned that failure to comply with the policy "will result in corrective action up to and including termination." *Id.*

The following day, Ms. Yockey emailed Kia Hinton, a Human Resources representative seeking to appeal the denial of her exemption request. ECF No. 49-1 at 110; ECF No. 49-9 at 2. She noted that she has relatives who are employed as clinical staff at both GBMC and University of Maryland St. Joseph Medical Center (UM SJMC), and that those relatives "submitted the same exact exemption" to both hospitals and the exemption was approved at UM SJMC. *Id.* She wrote, "[T]here should be no reason it's approved at one hospital and not at the other." *Id.*[4]

---

[4] Ms. Yockey testified in her deposition that she emailed Ms. Hinton to discuss other roles, but this email does not appear in any exhibit. *See* ECF No. 49-1 at 111, 113 ("Q [:] Okay. And what did you say to Ms. Hinton? A [:] I said that I am interested in exploring non-direct patient care positions for which I qualified.").

On September 30, Ms. Yockey emailed Ms. Hinton and GBMC's Chief Human Resources Officer Anna-Maria Palmer, "making [a] complaint to the Human Resources department of [GBMC]." ECF No. 48-10 at 2. She wrote, "I'm being discriminated against because of my religious beliefs and threatened with loss of employment if I do not follow the vaccine mandate to take this vaccine." *Id.* She stated that she had not been offered a reasonable accommodation and added, "I am willing to be tested weekly as a reasonable accommodation to the religious exemption as is the practice in other local hospitals." *Id.*

The next day, on October 1—the deadline to submit exemption forms—Ms. Yockey re-applied for a religious exemption. ECF No. 49-10. She attached a letter that contained some of the same language from the letter she submitted with her first application, this time signed by a Reverend Father. *Id.* at 5.[5] She also submitted her own letter stating, "I request that accommodate [sic] my sincerely held personal religious belief that I cannot take any of the currently available COVID-19 vaccines," along with a copy of her certificate of baptism, a letter from the associate pastor at Sacred Heart Catholic Church confirming that she is a registered parishioner in good standing with the church, and an additional "Affidavit of Membership in the Confraternity of Our Lady of Fatima." ECF 49-10 at 6-9.

On October 4, 2021, GBMC again denied Ms. Yockey's religious exemption. ECF No. 48-13 at 2. This denial letter reiterated that granting the request would "impose[] an

---

[5] Ms. Yockey obtained the letter "from the [National Catholic Bioethics Center] website." ECF No. 49-1 at 102.

undue hardship on GBMC" and that GBMC remained willing, "[a]s a reasonable accommodation," to consider her for any vacant non-direct patient care positions. *Id.*

### C.     Plaintiff's separation from employment

Ms. Yockey stated that she emailed Ms. Hinton on September 16, 2021, in response to the first denial to discuss other roles. *See* ECF No. 49-1 at 111, 113 ("Q [:] Okay. And what did you say to Ms. Hinton? A [:] I said that I am interested in exploring non-direct patient care positions for which I qualified.").[6] Ms. Yockey did not receive a response. ECF No. 49-1 at 111-12. Ms. Yockey emailed Ms. Hinton a second time on October 4, ECF No. 49-1 at 114. In reply, Ms. Hinton referred her to GBMC's career page and invited Ms. Yockey to "let [her] know which positions interest you." *Id.* at 112, 114. Ms. Yockey stated that there were available non-direct patient care positions for which she was qualified, but she did not apply for those positions because they "would not go with [her] schedule." ECF No. 49-1 at 115-16, 136. After that email exchange, Ms. Yockey did not have any other communications with Ms. Hinton about available positions. *Id.* at 115.

Ms. Yockey resigned at "the end of October," giving two weeks' notice. ECF No. 49-1 at 137-38. She stated that she did not want to resign but "didn't have any other option" because she was "going to be terminated." *Id.* at 138. She was put on administrative leave on November 1 and did not work after that date. *Id.* at 209. Her resignation became effective on November 14, 2021. *Id.* at 137-38.

---

[6] The referenced email does not appear in either party's exhibits.

### D.    Procedural history

Ms. Yockey filed the operative complaint in April 2023, alleging two counts of religious discrimination, under disparate treatment and failure-to-accommodate theories. ECF No. 13. GBMC answered the complaint, ECF No. 16, and in May 2024 filed a motion for summary judgment, along with its accompanying exhibits, ECF Nos. 48, 48-1 through 48-13. Ms. Yockey opposed the motion with her own exhibits, ECF Nos. 49, 49-1 through 49-15, and GBMC filed a reply brief, ECF No. 50.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because GBMC has moved for summary judgment, the Court must view the evidence in the light most favorable to Ms. Yockey, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in her favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination "because of . . . religion." 42 U.S.C. § 2000e–2(a)(1). "Courts have recognized that employees may utilize two theories in asserting religious discrimination claims." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996) (citing *Mann v. Frank*, 7 F.3d 1365, 1368-70 (8th Cir. 1993)). "These theories are denominated as the 'disparate treatment' and 'failure to accommodate' theories." *Id.*; *see also Wright v. Olin Corp.*, 697 F.2d 1172, 1184 (4th Cir. 1982) ("[I]t is often appropriate to assess particular

Title VII claims and defenses alternatively under different theories."). As noted above, Plaintiff's complaint asserts claims under each theory: Count 1 for "Disparate Treatment – Religion," and Count 2 for "Refusal to Provide Reasonable Accommodation." ECF No. 13 at 7-8.

In her response to GBMC's motion, Ms. Yockey only defends against summary judgment on her accommodation claim (count 2). *See* ECF No. 49 at 14 (main argument point heading: "Genuine issues of material fact preclude summary judgment in GBMC's favor on Ms. Yockey's *failure to accommodate claim*.") (emphasis added). So arguably she has forfeited any arguments as to disparate treatment. But for completeness, and because some aspects of her argument seem to invoke disparate treatment standards, *see, e.g.*, *id.* at 12 (contending that in applying its vaccine policy, GBMC engaged in "Discriminatory Treatment of Employees with Sincerely Held Religious Beliefs"), the Court will address her claims under both theories. For the following reasons, GBMC is entitled to summary judgment on both counts.

### A.    Plaintiff's failure-to-accommodate claim

As noted above, Title VII, among other things, prohibits employment discrimination based on religion. Section 2000e(j) "illuminate[s] the meaning of religious discrimination under the statute." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986). It defines "religion" as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate [the] observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). A religious "failure to accommodate" claim is based in this requirement under the statute.

In religious accommodation cases, courts apply a burden-shifting framework "akin to the one articulated by the Supreme Court in *McDonnell Douglas*." *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)). Under this framework, the plaintiff must first make out the elements of a *prima facie* case, which requires Ms. Yockey to prove that (1) she "has a bona fide religious belief that conflict[ed] with an employment requirement," (2) she "informed the employer of this belief," and (3) she "was disciplined for failure to comply with the conflicting employment requirement." *Id.* (quoting *Chalmers*, 101 F.3d at 1019). Once an employee makes out a *prima facie* case, the burden shifts to the employer to show that it could not reasonably accommodate the religious need without undue hardship. *Id.* To satisfy this burden, the employer must show either that it provided the employee with a reasonable accommodation or that it did not provide an accommodation because doing so would have caused an "undue hardship." *Firestone Fibers*, 515 F.3d at 312 (quoting *Chalmers*, 101 F.3d at 1019). Although the questions of reasonable accommodation and undue hardship are "separate and distinct," they are still "interrelated." *Id.* at 314. "For instance, an accommodation that results in undue hardship almost certainly would not be viewed as one that would be reasonable." *Id.*

GBMC argues that the failure-to-accommodate claim fails because the undisputed evidence establishes that Ms. Yockey's requested accommodation (masking and weekly testing) was not reasonable and posed an undue hardship. ECF No. 48-1 at 30-31, 33-35. It also argues that it offered Ms. Yockey a reasonable accommodation in allowing her to transfer to a non-direct care position, but that she chose not to accept the accommodation because it would not fit her preferred schedule. *Id.* at 8, 32-33. Plaintiff maintains there is a genuine issue of material fact about whether GBMC could

accommodate her religious belief without undue hardship. ECF No. 49 at 18-21.
Specifically, Ms. Yockey argues that GBMC has not shown that an undue hardship would
have resulted from her requested accommodation because the hospital where she
worked following her separation from GBMC granted her that accommodation in a
similar direct care position. *Id.* at 18, 20.[7]

Ms. Yockey's failure-to-accommodate claim fails because the undisputed
evidence establishes that GBMC could not have accommodated her vaccination
exemption without undue hardship. Title VII does not require an employer to grant a
religious accommodation if doing so would create an "undue hardship on the conduct of
the employer's business." 42 U.S.C. § 2000e(j). A "hardship" is "undue" where it is
"'excessive' or 'unjustifiable'" in the overall context of an employer's business after
considering all relevant factors, including an accommodation's practical impact given
the nature, size, and operating cost of the business. *Groff v. DeJoy*, 600 U.S. 447, 469-
71 (2023). Effects on co-workers are relevant to the hardship analysis when they affect
the "conduct of the employer's business." *Id.* at 472. A court must consider this question
in a "common-sense manner." *Id.* at 471. Hardship in this context is also not limited to
economic effects. "For instance, courts have found that non-economic costs such as
damage to employee morale, compromise of a collective bargaining agreement or
seniority system, or unequal treatment of other employees, can constitute undue

---

[7] Ms. Yockey also objects that GBMC did not "engage in an interactive process" with her
regarding her accommodations. ECF No. 49 at 16-18. But religious accommodations do
not necessarily involve an interactive process in the way that disability accommodations
often do. *See Ansonia*, 479 U.S. at 69 ("[A]n employer has met its obligation under [Title
VII] when it demonstrates that it has offered a reasonable accommodation to the
employee.").

hardships." *EEOC v. Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 752 (D. Md. 2021). This includes accommodations unreasonably imperiling employee safety. *See, e.g., EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship."); *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 758 (E.D.N.Y. 1998) ("Where . . . the proposed accommodation threatens to compromise safety in the workplace, the employer's burden of establishing an undue burden is light indeed."), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1976) ("safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business").

Ms. Yockey contends that a reasonable accommodation did exist, namely, "continued compulsory masking and weekly COVID-19 testing," and that GBMC could not establish that this accommodation would have imposed an undue hardship. ECF No. 49 at 13-14. GBMC argues that this requested accommodation was not reasonable due to the risk of virus transmission. ECF No. 48-1 at 31. Considering GBMC's circumstances in a "common-sense manner" in the "overall context" of GBMC's work, *Groff*, 600 U.S. at 468, 471, the undisputed evidence establishes that Ms. Yockey's requested accommodation presented an undue hardship to GBMC based on its significant and reasonable interests in avoiding transmission of COVID-19 among employees and patients—particularly given its *obligation* to its patients to keep them healthy, and at minimum not to expose them to *increased* risk of serious illness just for seeking medical care at GMBC.

GBMC's expert report indicates that as of mid-2021, there was "initial evidence of reduced secondary transmission from vaccinated people to their close contacts." ECF No. 48-3 at 4. In addition, the evidence at the time suggested that vaccinated individuals had a lower viral load compared to unvaccinated individuals. *Id.* "[T]he consensus among infectious disease experts was that vaccines were the best (safest, most effective, and most scalable) protection for patients and those providing care to them." *Id.* In other words, it is undisputed that GBMC relied on valid, scientific sources to support its decision to require vaccination among those who were engaged in direct in-person patient care.

The undisputed evidence also establishes that GBMC had valid reasons to attempt to reduce transmission of COVID-19 among patients and staff. As GBMC notes, health care professionals "have an ethical and professional duty to protect those they encounter professionally." ECF No. 48-2 at 5. And the need to limit COVID-19 transmission was even more acute during the height of the pandemic. At the time GBMC imposed its vaccine mandate, approximately 700,000 Americans had died from COVID-19. ECF No. 50 at 6 n.1, citing *COVID-19 U.S. Deaths*, World Health Organization, https://data.who.int/dashboards/covid19/deaths?m49=840&n=0 ("WHO COVID-19 Deaths report").[8] In September 2021, the United States averaged more than one million cases per week and, in October 2021, more than 10,000 Americans on average were

---

[8] Although Defendant's reply brief states that number of deaths was "nearly 900,000" at the time of the vaccine mandate, data from Defendant's cited source show there were 702,577 cumulative deaths as of October 3, 2021. *See Weekly COVID-19 Cases and Deaths by Date Reported to WHO*, World Health Organization, https://data.who.int/dashboards/covid19/data?m49=840&n=0.

dying each week from the disease. *Id*. at 7, nn. 3, 4 (citing *COVID-19 U.S. Cases*, World Health Organization, https://data.who.int/dashboards/covid19/cases?m49=840&n=0 ("WHO COVID-19 Cases report") and WHO COVID-19 Deaths report). The undisputed evidence establishes that the risks of COVID-19 transmission to Defendant's business were great enough that asking GBMC's staff and patients to take on more risk than GBMC deemed necessary based on the available scientific evidence posed an undue hardship.

The use of less effective prevention measures would have required GBMC to accept an increased risk that COVID-19 would be transmitted to other GBMC employees. The record evidence establishes that spread of illness among staff would have made it more challenging for GBMC to meet its staffing needs. Employees who contracted the virus would be unable to work while out sick. At certain points in the pandemic, hospitals "strained to maintain adequate staffing to provide both emergency and routine care for their patients." ECF No. 48-3 at 3.  GBMC in particular had experienced 18 months of staffing shortages while "caring for a maximum capacity patient load" during the pandemic. ECF No. 50 at 7. All that evidence is undisputed. In light of high hospitalization rates and periods of under-staffing at the time, ECF No. 48-2 at 7, ¶ 35, GBMC had a strong interest in preventing its employees from contracting COVID.[9] *See Groff*, 600 U.S. at 472 (holding that "coworker impacts that go on to affect

---

[9] In fact, while masking provided some protection against transmission in the hospital setting, vaccination provided protection in all of an employee's activities, including those outside the hospital setting. *See* ECF No. 48-3 at 6 (noting a contemporaneous study concluding that COVID-19 vaccination reduced household transmission) (citing Ross J. Harris, et al., *Effect of Vaccination on Household Transmission of SARS-CoV-2 in England*, New England Journal of Medicine (2021). The requirement, therefore,

the conduct of the business" are relevant to the analysis) (cleaned up). Allowing some employees to use less effective prevention measures at the risk of not only the health of GBMC's staff, but also GBMC's ability to appropriately staff its units, would have clearly presented an undue hardship within the meaning of *Groff*.

The undisputed evidence also establishes that GBMC relied upon evidence that the use of less effective prevention measures increased the risk that COVID-19 would be transmitted to GBMC patients. GBMC's daily work of serving vulnerable patients is central to a "common sense" analysis here. Many hospital patients are, by definition, unwell and may have compromised immune systems, whether acutely or chronically. It is, likewise, common sense that GBMC has an interest in avoiding additional health complications among its patients. Therefore, it was reasonable for GBMC to insist upon strong measures to prevent potential COVID-19 transmission to patients. Ms. Yockey's contention that only a few patients contracted COVID while hospitalized, ECF No. 49 at 21, does not create a genuine dispute as to whether strong prevention measures were justified. If anything, the fact that four or five patients *did* acquire COVID-19 while hospitalized underlines that the risks GBMC sought to mitigate were not merely hypothetical. *See* ECF No. 49-15 at 3.

Other courts confronting similar situations have reached the same conclusion regarding undue hardship. *See, e.g.*, *Kizer v. St. Jude Child.'s Rsch. Hosp., Inc.*, No. 2:22-cv-02620-TLP-cgc, 2024 WL 4834056 (W.D. Tenn. Feb. 9, 2024) ("allowing Plaintiff to come to work unvaccinated while continuing [masking, testing, and physical

---

reduced the risk of transmission overall, not just transmission that took place in the hospital.

distancing requirements] would have been a substantial burden for St. Jude," constituting an undue hardship due to health and safety concerns and potential legal liability); *Together Emps. v. Mass. Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435-36, 441 (D. Mass. 2021) (determining on a motion for a preliminary injunction that the hospital had a reasonable likelihood of success in showing undue hardship due, in part, to the need to minimize staff absences, the fact that the hospital is in the business of caring for medically vulnerable people, and the inadequacies of testing relative to vaccination); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, Case No. 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022) (granting summary judgment for hospital in part because exempting nurse from flu vaccine requirement and allowing her to wear a mask for religious reasons would pose an undue hardship, given the risk of transmission to patients).

For these reasons, there is no genuine dispute of material fact that GBMC could not have accommodated Ms. Yockey's vaccination exemption without undue hardship. Accordingly, GBMC is entitled to summary judgment on Plaintiff's accommodation claim.[10]

### B.    Plaintiff's disparate treatment religious discrimination claim

As explained above, Ms. Yockey relies exclusively on her failure-to-accommodate theory (count 2) in attempting to defeat GMBC's summary judgment motion. *See* ECF

---

[10] GBMC also argues that the claim fails because (1) the claims are barred by statute because Title VII protects employers who rely on an EEOC "written interpretation or opinion" from liability, ECF No. 48-1 at 35-36; (2) Plaintiff did not establish that her beliefs are sincerely held and religious in nature, *id*. at 27-30; and (3) the accommodation GBMC offered to her constituted a reasonable accommodation sufficient to additionally entitle it to summary judgment, *id*. at 32-33. Because GBMC is entitled to summary judgment on Plaintiff's failure-to-accommodate claim on undue hardship grounds, the Court need not and does not reach these issues.

No. 49 at 14. Her complaint also asserted a disparate treatment theory (count 1). ECF No. 13, ¶¶ 36-50. For the following reasons, GBMC is entitled to summary judgment on that count as well.

To establish a *prima facie* case of disparate treatment, an employee must show (1) membership in a protected class, (2) satisfactory job performance, (3) an adverse employment action, and (4) different treatment from similarly situated employees outside the protected class. *See Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024). When a plaintiff (as here) presents only indirect evidence of disparate treatment, courts generally apply the *McDonnell Douglas* burden-shifting framework. *See Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 464 (2002) (citing *McDonnell Douglas*, 411 U.S. at 802). If a plaintiff makes out a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption that the employment action was based on intentional discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255-56 (1981). To do so, the defendant must produce admissible evidence that, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis omitted) (citing *Burdine,* 450 U.S. at 254-55 & n.8). If the defendant produces such evidence, then the plaintiff must show "that the proffered reason was not the true reason for the employment decision." *Id.* at 507 (quoting *Burdine*, 450 U.S. at 256). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (quoting *Burdine*, 450 U.S. at 253).

GBMC argues Plaintiff's disparate treatment claim fails as a matter of law for two reasons: (1) she has not shown that she was treated differently from similarly situated employees outside her protected class, ECF No. 48-1 at 24-25; and (2) regardless, GBMC had a legitimate, non-discriminatory reason for its implementation of the vaccine mandate and there is no evidence that its employment actions were pretextual. *Id.* at 25-26. The Court holds that, for the latter reason, GBMC is entitled to summary judgment on the disparate treatment claim. The Court need not and does not reach the question of whether Ms. Yockey was treated differently than "similarly situated" employees.

Ms. Yockey's disparate impact claim fails because, based on the undisputed evidence, GBMC had a legitimate, non-discriminatory reason for its vaccination policy, and for requiring Ms. Yockey to comply with it, and there is no evidence from which a reasonable jury could conclude that this reason was pretextual. Because Ms. Yockey has "fail[ed] to make a showing sufficient to establish the existence of" pretext, GBMC is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Although Defendant's burden is merely "one of production, not persuasion," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000), as explained above, the undisputed evidence amply establishes that GBMC had a legitimate, non-discriminatory reason for its requirement, during the height of the pandemic, that employees who were in direct care positions, and were medically eligible for vaccination, be vaccinated against COVID-19 to "provid[e] the greatest protection possible to its medically vulnerable patients and its employees," ECF No. 48-2 at 5, ¶ 28, and for

applying that requirement to Ms. Yockey. *See* § III.A, *supra*.[11] That undisputed evidence amply satisfies GBMC's burden of production under the *McDonnell Douglas* framework.

That means the burden shifts back to Plaintiff. *Burdine*, 450 U.S. at 256. To avoid summary judgment, Ms. Yockey would have to be able to point to admissible evidence in the record from which a reasonable jury could find that GBMC's valid, non-discriminatory reasons for requiring vaccination were, in fact, a pretext for religious discrimination. *See Hicks*, 509 U.S. at 507-08. A showing of pretext is an important step in allowing the factfinder to reason that the motive for the employment action was *not* what the employer contends, but rather, was impermissible discrimination. *See id.* at 515 (reasoning that a plaintiff cannot prove that a reason is "'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason"). Title VII plaintiffs like Ms. Yockey retain the burden of persuasion to ultimately show that the defendant intentionally discriminated against them. *See Hicks*, 509 U.S. at 511; *see also Burdine*, 450 U.S. at 256 ("This burden [of demonstrating pretext] now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.").

"[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th

---

[11] Although the Court does not reach the issue of whether Ms. Yockey was constructively discharged, as she contends, ECF No. 49 at 22, or whether she resigned voluntarily, as GBMC alleges, ECF No. 48-1 at 16, for the reasons explained in this section, the undisputed evidence establishes that GBMC had a legitimate non-discriminatory basis for any employment actions it took pursuant to its vaccination policy.

Cir. 2019) (citation omitted). A plaintiff may also attempt to "amass[] circumstantial evidence that . . . undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). But the mere offer of some evidence to challenge the alleged non-discriminatory reason is not necessarily enough to preclude summary judgment in the employer's favor; the offered evidence must be sufficient for a factfinder to find that the employer's justification is false. *Reeves*, 530 U.S. at 148. And even then, "there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* On a motion for summary judgment, the court must evaluate "'the probative value of the proof that the employer's explanation is false.'" *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 215 (4th Cir. 2007) (quoting *Reeves*, 530 U.S. at 149).

Here, Ms. Yockey does not explicitly address the issue of "pretext" in either her amended complaint or her reply to the motion for summary judgment. But she does offer several reasons why she believes GBMC's refusal to allow her requested accommodation is suspect. Specifically, she notes that (1) her requested accommodation of masking and weekly testing had been acceptable at GBMC in the past, (2) a different hospital allowed her to work with her requested accommodation in a direct care position, (3) only a few patients contracted COVID-19 while hospitalized at GBMC, and (4) GBMC no longer has a vaccine mandate. ECF No. 49 at 5, 18, 20-21. Drawing all reasonable inferences in her favor, *Scott*, 550 U.S. at 378, the Court interprets these arguments as allegations that GBMC's reasons for were pretextual.

Even under this interpretation, Ms. Yockey's evidence comes nowhere close to sufficient for a reasonable factfinder to conclude that GBMC's reasons for its actions

were pretextual—*i.e.*, that GBMC's vaccine mandate (or GBMC's application of the policy to her) was not about protecting patients and staff but rather was a veiled attempt to discriminate on the basis of religion. Nor does this evidence establish that GBMC's "proffered explanation is unworthy of credence." *See Burdine*, 450 U.S. at 256. The Court will address each of Ms. Yockey's contentions in turn.

Ms. Yockey's first argument is that GBMC's past use of masks and weekly COVID-19 testing as prevention measures is an inconsistency that supports pretext. ECF No. 49 at 18. While a plaintiff may point to inconsistency as evidence supporting pretext, inconsistencies are not always probative of pretext. *See, e.g., Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000) (stating that evidence of inconsistent explanations in how a company selected salespeople for termination was "simply not probative of pretext" because only one person made the firing decisions, and a different employee's statement about what factors they believed that person considered were not relevant to what actually motivated the decision making). Here, the record establishes multiple non-discriminatory reasons for this inconsistency. First, for much of the time that GBMC relied on masking and/or testing for prevention, vaccines were not yet available. *See* ECF No. 48-2 at 5, ¶ 27; ECF No. 49 at 7. Second, at the time GBMC introduced its vaccine mandate, there was new evidence about how COVID-19 is transmitted and the efficacy of vaccines in preventing transmission and infection. ECF No. 48-3 at 6 (citing evidence from the CDC in May 2021 that "mRNA vaccines from Pfizer-BioNTech and Moderna reduced risk of SARS-CoV-2 infection by 94%"). GBMC relied on scientific evidence available at the time to inform its vaccination policy. ECF No. 48-2 at 6, ¶¶ 29, 30. Finally, the vaccine mandate was imposed at a time when the numbers of infections

and deaths were rapidly rising. ECF No. 50 at 6-7 (citing WHO COVID-19 Deaths report and WHO COVID-19 Cases report).

Ms. Yockey's evidence that the hospital where she went on to work following her resignation permitted her to work with her requested accommodations likewise does not suggest that GBMC's stated reasons for its enforcement of the vaccine mandate were pretextual. Ms. Yockey's employment conditions at another hospital are evidence *that* GBMC acted differently from other hospitals, but it is not probative as to *why* GBMC acted differently. In other words, even if another hospital reached different conclusions in the face of the same scientific evidence, that does not come close to suggesting that GBMC's "asserted justification" for its policy was "false." *See Reeves*, 530 U.S. at 148.

Ms. Yockey's remaining evidence challenging GBMC's articulated reasons for its enforcement of the vaccination policy are also unavailing. Even if only a few patients contracted COVID-19 while hospitalized at GBMC, that fact is not probative of whether GBMC's offered reasons were pretextual. Similarly, Ms. Yockey's contention that GBMC no longer requires COVID vaccination does nothing to suggest that GBMC was acting pretextually in requiring vaccination in late 2021 to reduce COVID-19 transmission based on health and safety concerns.[12] If anything, the fact that, since April 2023, GBMC

---

[12] The current status of GBMC's COVID-19 vaccine mandate is disputed. Ms. Yockey stated in her opposition brief in June 2024 that "GBMC no longer has a COVID-19 vaccine mandate." ECF No. 49 at 5. GBMC has denied that it had no COVID-19 vaccination requirement for employees as of, presumably, early 2024. *See* ECF No. 49-15 at 3. Dr. John Flowers, GBMC's Chief Medical Officer, stated in a May 2024 affidavit that "[o]n April 17, 2023 . . . GBMC again updated its vaccine policy to consider and approve religious exemptions to its COVID-19 vaccine requirements for direct care providers, consistent with GBMC's flu vaccine requirement." ECF No. 48-2 at 10, ¶ 60.

has rehired several nurses who were fired for non-compliance with the policy, and have since granted them religious exemptions, see ECF No. 49-15 at 6, further supports GBMC's contention that the policy was about safety and disease transmission—not about any employee's religious beliefs.

In light of these considerations, and the absence of any other evidence that GBMC's actions were based on religious discrimination, Ms. Yockey has not set forth sufficient evidence to show that GBMC's alleged reasons for its employment actions are false. *See Hicks*, 509 U.S. at 515; *Reeves*, 530 U.S. at 148. GBMC is, therefore, entitled to summary judgment on Plaintiff's disparate treatment claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant GBMC's motion for summary judgment, ECF No. 48. An appropriate order follows.


Date:  March 18, 2025                              _____/s/_____

                                                   Adam B. Abelson
                                                   United States District Judge

---

But for the reasons discussed above, insofar as there is a dispute in the record about GBMC's current COVID vaccination policy, any such dispute is immaterial.